Loring, J.,
concurring:
The question bere is as to the legal obligation of tbe United States for tbis claim; whether it has those equities which make it of moral obligation, is for Congress to determine. And, though persistently-urged, Congress has never admitted in this case such equities or such obligations.
As to the legal obligation of the United States, I adhere to the opinion of the majority of this court at the last trial of the case. No new evidence has been adduced, and only one new ground of claim has been suggested by the counsel for the petitioner.
Previous to the treaty of 1819, Spain claimed that her provinces of East and West Florida extended westward to the Mississippi river, including a large portion of what is now the State of Alabama, and that her province of Texas extended eastward from the Rio Grande to the river Mermenteau, including a large part of what is now Louisiana. While the United States claimed that their territories, ceded by France by the treaty of 1803, extended eastward from the Mississippi to the Perdido river, the present western boundary of West Florida, and southward from the Mississippi to the' Rio Grande. This wide extent of debatable land had led to disputes and collisions between the inhabitants, citizens of either nation, and to this had been added alleged wrongs on either side. Spain complained that her territory had been invaded, her cities captured, and her citizens despoiled. While the United States complained that her people, on the sea and the land, had been assailed by force, their ships captured, their property seized, and they imprisoned in dungeons and irons. Angry correspondence had ensued between the governments, and ended in the rupture of diplomatic relations. This state of things continued till mutual aggravations made it intolerable, and then, on overtures from Spain, diplomatic relations were renewed, and negotiation followed on the subjects of dispute, i. e., of limits and the claims of citizens, and resulted in the treaty of 1819, significantly declared in its title to be “ a treaty of amity, settlement, and limits.”
By the second article of the treaty Spain ceded to the United States the Floridas; and the United States relinquished to Spain the territory from the Sabine river to the Rio Grande, comprising the whole of the State of Texas, which, as claimed by the Spanish negotiator, (4 State Papers,) far exceeded, in extent and fertility, the Floridas. And thus the question of limits was settled.
The question of settlement of claims of citizens was adjusted by the ninth article of the treaty, by which the high contracting parties re *281 nounced the claims of their respective citizens, to the extent set forth in specific renunciations. Of the five specifications of renunciation by the United States, the fifth was declared to extend “to all claims of citizens of the United States upon the Spanish government, statements of which, soliciting the interposition of the government 'of the United States, have been presented to the Department of State or to the minister of the United States in Spain, since the date of the convention of 1802 and until the signature of this treaty.”
Then for the execution of the five renunciations on the part of the United States, the eleventh article declared as follows: “The United States exonerating Spain from all demands in future on account of the claims of their citizens, to which the renunciations herein contained, extend, and considering them entirely cancelled, undertake to make satisfaction for the same, to an amount not exceeding five millions of dollars.” Then the same article provided for three commissioners to he appointed by the President, by and with the advice of the Senate, to receive, examine, and decide upon, the amount and validity of all the claims included within the renunciations.
The words “not exceeding five millions of dollars,” of their own force limited the liability of the United States to the sum specified. So that the dollars enumerated make the only fund and the only property subject to claim under the treaty. And all that any claimant can be entitled to by the treaty is his proportion of that fund, adjudged by the commissioners.
The treaty signed February 22, 1819, was the same treaty ratified and exchanged between" the high contracting parties February 19, 1821. And the delay of its ratification by Spain, submitted to by the United States, only extended the time for its ratification, and in no way or degree annulled ox remitted its obligation as an agreement authoritatively made. This was held by the government of the United States always and persistently, audit was a political question affecting the foreign relations of the government; and; therefore, its decision by the political branch of the government was and is conclusive on the judiciary. And, as a matter of fact, the treaty was not altered or modified in any way; not a word or letter was changed. And it was ratified by Spain and the Senate of the United States exactly as it was originally signed, and in its ratification by the Senate it was declared to be “ the treaty made and concluded on the 22d day of February, 1819.” (4 Am. St. P., p. 703.)
It is claimed here as before, in behalf of the petitioner, that the United States, by the treaty of 1819, released Mr. Meade’s claim on *282 Spain without bis assent or authority. But, by the express terms and admitted operation of the treaty, it released only those claims which had been filed for that purpose by the claimants themselves, before its signature on February 22, 1819. Mr. Meade so filed his claim on January 17, 1819, and thus released it himself by his own voluntary act. And in this Mr. Meade sought to place his claim within the treaty on the same ground as the claims of other claimants. And this the government permitted, with an advantage to him much more clear than its equity to others, for their claims were on torts for which the government was bound to procure redress, while his claims were, for the greatei: part, on contracts for which the government was not bound to intervene. And this action of the government in Mr. Meade’s favor is its only special action on his claim shown in the case.
It'is stated in the petition and in the brief of the counsel for the petitioner, and was emphasized in their arguments, that the release of Mr. Meade’s claim was the consideration for the cession of the Floridas, and this was urged as if that release had acquired for the United States the Floridas and their territorial advantages. This may as well be claimed for all the other claimants, of whom many had borne larger losses and greater sufferings than Mr. Meade. But I think it is true of none, and that it mistakes the facts and perverts the relation of the parties, and that the claims released did not enter into the consideration of the cession, and in no way connected the claimants under the treaty with the Floridas. The consideration of the cession of the Floridas was the release of territory made by the United States, and five million of dollars paid by them to Spain through her creditors ; and their claims being of the amount contemplated, it was, as a matter of pecuniary interest, entirely immaterial to the United States whether they paid the sum stipulated to the creditors of Spain or into her treasury.
In the next place, the release of those claims was by the free and voluntary act of the claimants in filing their claims, made by them to Spain, and it inured to her benefit only ; and its only consideration was their receipt of her money which she raised by the sale of the Floridas to the United States. And this makes the position of the parties, in which the United States are the vendee who has hona fide paid in full the price stipulated. And at law and equity such a vendee takes the land discharged of all claims and equities of the vendor or his creditors, especially when, as in this case, the vendee, by an arrangement made by him for the benefit of the creditors, has secured to them the money *283 paid, instead of giving it into the hands of their needy and bankrupt debtor.
The eloquent counsel who closed the case for the petitioner urged upon the court the constitutional provision which prescribes compensation for private property taken for public use. As that provision .is in the Constitution, it cannot be and, I believe, never has been questioned in any court of the United States. It certainly has never been questioned, and has been often applied in this court, but I think it has no application in this case; because Mr. Meade released his claim for a stipulated consideration, and under a special contract, and his rights and the obligations of the United States are under and according to that contract, which necessarily precludes any resort to the constitutional provision. The learned counsel, referring to Mr. Meade’s claims, said, “these claims were included in the terms of the treaty for indemnification,” and he added, “I go one step further and say that the claims thus included in the treaty could not be got out of the treaty.” I so understand the law and the facts, and so did the ma--jority of this court in its former decision of this case, and, therefore, they held that Mr. Meade’s rights were under and according to that treaty, and that only.
This claim to the constitutional provision is rested on the assertion that the United States released Mr. Meade’s claim under their right of eminent domain. But the circumstances furnished no occasion and no opportunity for the exercise of that right. The release to Spain of the claims upon her of American citizens, was not a public necessity nor a public advantage; nor, as has been said, was it the means of, or incidental to, the cession of the Floridas; by it the United States gained, and sought to gain, nothing. And they paid the same price for the Floridas with as they would have paid without such release, and that inured in no way to their benefit. And their only action in the matter was, that at the request and for the benefit of the claimants, and with the assent of Spain, the United States paid the purchase money of the Floridas to such claimants instead of to Spain. And Mr. Meade’s claim was released to Spain, not under the right of eminent domain, or by any right inherent in the treaty-making power, but at his requirement and in execution of the authority given by him.
In his letter to Mr. Adams, of June 6, 1818, Mr. Meade, after referring to his claims on -Spain and the treaty then under negotiation, declares his reliance on his government to support his just claims, and concludes thus : “ being convinced that whenever such an event does take place, provision will be made for the claims of our citizens.” *284 Thus claiming for bimself the provision that might be made for his fellow-citizens, and no other. And in his reply, Mr. Adams stated the intention of the government to provide for “just claims of many of its citizens,” and then added these words : “ among which every attention which may he proper will be shown to yours.” Thus placing Mr. Meade’s claims on the same ground as those of other claimants, and declaring expressly, what would have been a necessary implication from the circumstances and the relation of parties, that, in the negotiation between the two nations, it would be for the government of the United States to determine what action would be proper for it in regard to the individual claims of our citizens, in the course of a negotiation involving national interests also. And the President, as the petition shows, indorsed on Mr. Adams’s letter this direction as to Mr. Meade’s claim: “ His claims, with those of every other citizen, will be carefully attended to and provided for as far as the government may he able.” Thus declaring what was self-evident, that for him and for all, the degree or amount of redress attainable must depend on negotiation. And thus advised, Mr. Meade filed his claims of tort and contract, and invoked the interposition of his government, upon the terms stated to him.
I do not propose to reargue the law of this case, but only to consider the evidence relating to the facts alleged by the petitioner, and on which his counsel have rested his case.
First. It was contended for the petitioner that the United States assumed or became liable to pay Mr. Meade’s claim by reason of its liquidation between Spain and Mr. Meade, with the co-operation of the United States.
It is observable that this wa3 never claimed by Mr. Meade till after it was known that the treaty fund of five millions would pay but a percentage on the claims filed; and then, as now, it was not claimed on any express undertaking on the part of the United States, but only as an inference from facts in evidence, and the question is, whether that inference is the proper inference from the facts shewn.
The gist of the allegation is the co-operation of the United States in the liquidation of Mr. Meade’s claim between him and Spain ; and in reference to that the whole action of the United States consists of two facts: First. That our minister at Madrid, Mr. Erving, at Mr. Meade’s request aided him in his affairs with the Spanish government, and transmitted to the Spanish secretary of state Mr. Meade’s memorials to the King, and the manner of this is thus described by Mr. Meade in his memorial to Congress, (4 Am. St. P., 713:) “ He” (the *285 memorialist) “ bad from tbe commencement of his difficulties invoked and obtained the good offices and active assistance of his country’s representative at the court of Madrid, and enjoyed the benefit of them throughout the whole of his toilsome and long-deferred solicitations for justice; but he availed himself of them merely to reenfore his own personal exertion to obtain a specific settlement between the Spanish government and himself, and by no means as committing the claim to any negotiation between the two governments on affairs of national import.” And of the transmission of the memorials he says, (lb., p. 705,) “ Having experienced throughout the whole affair the greatest inconvenience from the dilatory proceedings of the Spanish government, I presented in the month of December, 1818, a memorial to the King, backed by an official letter from Mr. Erving, urging the appoint-men, of two or three persons in the entire confidence of the King, to audit and settle my claims.”
The second fact is, that after the Spanish liquidation was made, Mr. Meade and Mr. Erving severally informed Mr. Adams of it, and he made a courteous reply to Mr. Meade. Mr. Meade in his letter to Mr. Adams, which enclosed certificates of the liquidation, wrote as follows : “ The perusal of these documents will, I trust, convince the President and yourself that the interference of the government has not been bestowed on a person unworthy of the high protection he has received.” And Mr. Adams in his reply .says : “ It gives me pleasure to offer you my congratulations upon the adjustment of your account with the Spanish government, and to assure you that this government feels not a little gratification in having at all contributed to the satisfactory result.”
Now every citizen in a foreign country is entitled to what Mr. Meade terms “ the good offices and active assistance of his country’s representative” there, who is the proper medium of communication between the citizen and the foreign government; and in rendering such aid and protection our government performed only its duty, and that, therefore, is to be taken as the intent and the only intent of all acts referable to it. And if the facts stated, viz., the action of Mr. Erving and the letter of Mr. Adams, can be accounted for by that duty of the government and the usual courtesy of diplomatic correspondence, then they cannot be referred to anything else, or used as the evidence of anything more. It never has been held that the attorney who in the performance of his legal duty files his client’s writ in court thereby assumes or becomes liable to pay the judgment recovered *286 against the defendant. Yet the grounds for such an inference seem to me quite as strong as those for the inference claimed here.
But this ground of claim is not left to inference. Mr. Erving testifies that his services to Mr. Meade were rendered on the ground that he was an American citizen in a foreign country needing his official aid. After stating his own position as minister and Mr. Meade’s residence in Spain, Mr. Erving says as follows : “ In all my correspondence and communications with the said .Richard W. Meade I constantly considered and treated him as a citizen of the United States, and when he was unjustly imprisoned by an arbitrary act of the Spanish government I demanded his release, as well before as subsequent to the proceedings of Congress in that case, and after his release I transmitted sundry of his memorials to the secretary of state of the Spanish government demanding compensation for the damages which he had sustained by the aforesaid unjust and arbitrary imprisonment, as well as the liquidation of his other claims on that government.” Here Mr. Erving not only refers “ the good offices and active assistance” which he officially rendered to Mr. Meade to his American citizenship, but he adduces them as evidence of that citizenship, and Mi. Meade took the testimony to be so used before the American commissioners under the treaty of 1819. (P. 98, Record.)
And Mr. Meade himself states very emphatically in what intent “ the good offices” of his government were solicited, received and rendered. In his memorial to the American commissioners, (4 Am. St. P., 734, Rec., 74,) after stating that as the creditor of Spain he has never committed his claim to the management and discretion of the government any further than to invoke the interposition of its “ good offices,” he thus concludes : ‘‘ So that the entire agency of the American functionaries, as auxiliary to individual demands and resources of the creditor, was merely gratuitous and in the ordinary routine of diplomatic comity.”
That a citizen in a foreign country is entitled to “ the good offices and active assistance of the representative of his government” there, and that it is the duty of the government to render them, is of universal acknowledgment among all civilized nations. But probably never before were such services converted by the citizen who received them into a ground or evidence of a pecuniary claim against the government who rendered them.
Then the evidence shows that the United States in no way intervened in the litigation before the Spanish junta or commission, and was not called upon to do so by either of the parties to it. When the *287 junta convened it notified Mr. Meade and Mm only to attend it. It specified a full bearing for bim, and no one else. It called on bim, and bim only, for proof, and Mr. Meade alone furnished the evidence and conducted the procedure in what he terms “ a laborious and minute investigation of six or seven months’ durationand when the liquidation was made, its certificate and authentication were given to him. And all this confirms and. verifies Mr. Adams’s official statement that “ the liquidation was made without the privity of this government,” (4 Am. St. P., 704;) and certainly this official statement of the Secretary of State of a matter of fact necessarily within his personal knowledge is entitled here to respect and credence; and if it is, then as there is no evidence that conflicts with it, and no fact that militates against it, I think it disproves the allegation that the liquidation of Mr. Meade’s claim against Spain was made with the co-operation of the United States.
Second. It is contended in behalf of the petitioner that the circumstances stated, viz., the extension of the time for the ratification of the treaty, and the liquidation of Mr. Meade’s claim between him and Spain, with such action and knowledge on the part of the United States as is shown in the evidence, removed Mr. Meade’s claim from the treaty, so that the United States had no right to release it.. But Mr. Meade, Spain, and the United States. all held that Mr. Meade’s claim remained in the treaty after and notwithstanding all the circumstances stated; and it would seem that as between them the fact should be, and necessarily is, fixed by their concurrence in it and action upon it. The purpose of filing Mr. Meade’s claim under the treaty was to secure a lien for its payment from the provisions of the treaty, and it is not obvious why the agreement as to its amount between him and Spain should forfeit the lien he had thus acquired, for it might be a means of furthering it, and the evidence shows that it was thus intended, and that the liquidation was made by Mr. Meade with the avowed purpose of presenting his liquidated claim under the treaty if that was ratified.
The Spanish commission or junta which made the liquidation, in their official report to the King, state as follows: “ The junta heard Mr. Meade, * * * * he expressing verbally to the junta that his desires were to have his claim settled in order to claim the amount from the government of the United States in case that the treaty pending between the two nations should be ratified.” At this time, May, 1819, no question had arisen as to the sufficiency of the treaty fund to pay in full the claims upon it. But after that question *288 bad arisen, and in reference to it in June, 1820, Mr. Meade, in bis memorial to tbe Cortes, stated tbe liquidation of bis claim and tbe condition of tbe Spanish finances, and then said as follows : “ In consideration thereof Meade has determined to propose to tbe Spanish congress that if it should adopt the resolution of ratifying tbe treaty of cession of tbe territory of tbe Floridas to tbe American republic, it would keep in mind this debt, in order that, as being comprised in the stipulated indemnities, tbe payment of this sum should enter as a consideration with that preference which justice, tbe privileged nature of tbe demand, and its merit require, for which purpose it ought to be excluded from all pro rata payment, and that the total amount should be paid with interest from tbe date of tbe liquidation,” &c., &c. (Record, p. 5.)
Then, in October, 1820, when tbe Spanish Cortes was considering upon its assent to tbe ratification to tbe treaty, and as a preliminary to that, they sought to verify Mr. Meade’s statement in bis memorial, and to fix tbe fact that bis claim was included in tbe treaty; they inquired of tbe Spanish secretary of state and of our minister at Madrid, and they were informed by both of these officers that Mr. Meade’s claim was included in tbe treaty. (4 Am. St. P., 726, 727, and 728.) And on that understanding tbe Cortes assented to tbe ratification, and tbe King made it, and with tbe knowledge of all this our government accepted it and gave their own. Against facts like these I think it cannot be argued or asserted that tbe claim of Mr. Meade was removed from tbe treaty by tbe circumstances stated or any other.
After Spain bad ratified tbe treaty and tbe protracted negotiation by which tbe United States.bad labored to secure tbe treaty as it was signed bad thus been brought to a successful close, Mr. Meade, in bis memorial to tbe President dated February 8, 1821, claimed that tbe United States should pay him bis debt in full or alter the treaty by expunging from it tbe fifth renunciation and all provisions for our citizens, or else bis individual claim; and then be for tbe first time contended that bis claim was removed from tbe treaty by tbe circumstances I have considered. The United States did not accede to either of these propositions ; they did not by a payment in full prefer Mr. Meade to other claimants whose rights and equities were stronger than bis, or defeat tbe treaty and tbe public interests and tbe public faith involved in it, but ratified it, as Spain bad at last ratified it, as it was originally agreed and signed between them.
It was claimed on behalf of tbe petitioner that tbe liquidation removed Mr. Meade’s claim from tbe treaty, “except so far as to release *289 Spain from all responsibility for its payment — sbe paying to the United States the original consideration agreed upon between them.” But so did the United States pay to Spain the original consideration agreed upon between thenú and all they would have paid had Mr. Meade’s claim been proved and satisfied under the treaty; and if the liquidation removed the claim from the treaty as to either party, it must be as to Spain, for she and she only was actor, both in the treaty and the liquidation, and was therefore chargeable with privity in both and its full legal consequences. And if the claim was removed from the treaty, then it would not be released by the treaty, and the United States would not be liable upon it at all, for their only connection with it was by the treaty, whereas Spain would remain liable on her liquidation, which was her free and voluntary act affirming her original indebtedness; and this, Mr. Moade claims, would be the consequence of removing his claim from the treaty, in his memorial to the President, dated February 8, 1821. ’
Third,. It is alleged in the petition as' follows : that “ the ratifica • tion of the said treaty by Spain was obtained on the assurance of the minister of the United States that the said claim, as allowed, would be paid by the United States, they receiving as an equivalent the abrogation of certain grants which had thereupon delayed its ratification.”
This allegation requires stringent evidence, for it is extreme. In substance it is this : that this important treaty between the nations, by which they mutually arranged territories large enough for kingdoms, and established their limits, redressed mutual wrongs, closed the angry dissensions of years, averted war, and secured peace that has now lasted half a century; that all this was conditioned by Spain on the difference to Mr. Meade between a payment pro rata and a payment in full.
Now, the evidence shows that the United States insisted, arid the Spanish government admitted, that after the inception of the negotiation of the treaty of cession no grants of lands in the Floridas could be made by Spain to individuals, because such grants would diminish or destroy the value of the contemplated cession to the United States. And Mr. Meade, in his first letter to Mr. Adams, of June 6, 1818, states his knowledge of this as follows : “ It has been insinuated to me that if I could procure and advance a further sum in cash, a cession of lands might be procured in either of the Floridas to cover the probable amount of said advance and my claims. No specific proposal has been made to me, or have I dared indeed to listen to any, *290 till (lest) I should receive the approbation of the President on the subject, as I have been led to suppose that the government of the United States have required or said that no cession of lands made after a certain date would he admitted in case of the Floridas being ceded in sovereignty to the United States.” And this Mr. Adams confirms in his answer.
Then, it is certain on the evidence that the abrogation of all the grants was provided for in the terms of the treaty as it was signed, as an indispensable part of its consideration, and by words advisedly adopted and agreed upon for the purpose ; and this was formally declared in writing by the Spanish and American negotiators, and the French minister who acted in the negotiation ; and the evidence of this was sent to Mr. Forsyth, with the treaty signed, to exchange ratifications with the Spanish government; and as to the abrogation of grants he was instructed as follows : “You will explicitly declare that the United States have no compromise to make, and will listen to none.” And this was all of Mr. Forsyth’s authority on the subject. (4 Am. St. P., 650 to 660.) And in the protracted negotiations that the Spanish government interposed between the liquidation and its ratification of the treaty, it attempted to use the abrogation of the grants to gain something, not for Mr. Meade, but for Spanish claimants under the treaty of 1802, and then for the Spanish grantees of the abrogated grants, {lb., 703;) and this was peremptorily refused by our government, and the Spanish government was told by Mr. Forsyth, at Madrid, (lb., p. 695,) that he had no authority to make any stipulations; and by Mr. Adams, at Washington, that the United States could not stipulate new engagements as the price of obtaining the ratification of the old, (lb., p. 683 ;) and in this Spain acquiesced, and thereupon the ratifications were exchanged. (lb., 703.) And in all the negotiations between the two governments, which the evidence exhibits in full, there is not one-word connecting Mr. Meade’s claim or name with the abrogation of the grants, nor a particle of evidence of the alleged intent in his favor, on the part of the Spanish government, nor of the communication of any such intent to our government; and the first suggestion of it to them is the allegation of Hr. Meade, in his memorial to Congress, (4 Am. St. P., 732,) which he himself says (lb., p. 733) was not presented till after the treaty had been ratified by the Senate, and which the evidence shows was dated December 24, 1821, three days after such ratification.
And, moreover, Mr. Meade’s statement, and its only evidence, Mr. Guerra’s deposition, (4 Am. St. P., 727,) refer to the alleged intent *291 of tbe Cortes in Mr. Meade’s favor, not as expressed in any vote or act of tbe Cortes, but only as tbe motive and inducement of its members in giving tbeir assent to tbe ratification of the treaty to their King. But tbe proceedings of a legislative body are not determined by tbe secret motives which actuate its members in giving tbeir votes, but by tbe official action of tbe collective body as shown and promulgated in its formal enactments ; and it is not claimed or suggested that tbe vote of tbe Cortes giving to tbe King their assent to tbe ratification, contained any condition or qualification or any reference to Mr. Meade; and tbe evidence makes it certain that the ratification by tbe King officially communicated to our government was of tbe treaty as it was signed, and without any qualification or reservation whatever; and so it was ratified by our government.
In bis memorial of February 6, 1821, addressed to tbe President and submitted by him to Congress, Mr. Meade argued bis case in extenso, and all be says as to the action of tbe Cortes is as follows : “ They ordered that my memorial should be united with tbe papers relative to tbe treaty and submitted to tbe King, in order to have it ascertained whether tbe American government bad consented to tbe introduction of my individual claim into tbe negotiation of tbe treaty, and if so, that tbe American government bad distinctly assumed upon itself tbe payment of my claim, and bad wholly exonerated Spain from it.” Now, the only fact stated here is that tbe Cortes, before giving tbeir assent to the ratification of tbe treaty, sought to ascertain that Mr. Meade’s claim was included in it, so that it would be paid under it, and tbe Spanish treasury exonerated from it; and the rest of Mr. Meade’s statement is referable to bis misapprehension, as the evidence shows that tbe Spanish Cortes by their committee sought tbeir information from Mr. Forsyth and tbe Spanish secretary of state, and that our government in no way acted on bis individual claim, and that in tbe negotiation of tbe treaty neither bis name nor that of any individual claimant was even mentioned. (4 Am, State Papers, 704.)
Then, as to tbe evidence of Mr. Forsyth’s assurances; and in considering them it is to be remembered that the only matter of pecuniary interest to tbe Cortes was that Mr. Meade’s claim was included in tbe treaty, because if it was, then Spain would be exonerated from it, and equally so whether it was paid under tbe treaty in full or fro rata, and tbe Spanish government claimed this, as Mr. Meade states in bis memorial to the President of February 8, 1821. (Record, p. 60.)
Now, one witness only testifies as to Mr. Forsyth’s assurances, Mr. Guerra, who, after stating that be and Mr. Isturiz were a committee *292 of the Cortes, and waited on Mr. Forsyth, proceeds thus: “ and obtained from that gentleman the clear and distinct assurance that the debt due to Richard W. Meade would certainly be paid to him by the United States, if the treaty were ratified and the cessions above mentioned totally annulled.” This is all the evidence of Mr. Forsyth’s assurances, and it is given not as his words, but as Mr. Guerra’s conclusion from them, and it is observable that it does not refer to the Spanish liquidation, or any special provision for Mr. Meade, but only states as a consequence of the ratification of the treaty, and the abrogation of the grants the treaty provided for, that Mr. Meade’s claim would be paid under it by the United States, and this was the necessary consequence of Mr. Meade’s claim being included in the treaty. And in reference to his conversation with the gentlemen named, Mr. Forsyth says : “ The Cortes may have given them such a commission, and the conversation may have been held in consequence thereof. If it was, I have no recollection of it, and do not know that they were conversing with me officially, and certainly did not say more than that Mr. Meade’s claim was included in the treaty of 1819.” And six other members of the Cortes testify as to its understanding of Mr. For-syth’s assurances, and not one of them says more than that it was -understood Mr. Meade’s claim was included in the treaty; and four of the six expressly mention, as the claims of other American citizens •were.
But the point of the allegation is : a separate provision or preference for Mr. Meade outside of the treaty, founded on the assurances of Mr. Forsyth. As to this, Mr. Forsyth testifies as follows in the deposition before quoted from: “ The only conversation I distinctly recollect was held with Martinez de la Rosa, also a deputy of the Cortes and of the commission to whom was referred the treaty of 1819. Having ■heard by accident that an attempt was to be made to make a distinction, favorable to Mr. Meade, between his claim and the claims of other persons embraced in the treaty, I expressed my conviction to Mr. de la Rosa that the claim was just and was provided for in the treaty, but that it ought to be left to share the same fate as to its payment with the equally just claims of other citizens of the United ' States.” This, certaiuly, is entirely at variance with any idea of a special provision for Mr. Meade outside the treaty, for it places him within the treaty, to stand there as other claimants stood. And it went to the Cortes and the commission charged with the treaty as the authoritative declaration of our minister.
And it is certain that the Spanish Cortes and government had the *293 treaty before them, and knew it included Mr. Meade’s claim and what provision it made for all elaims included in it. And they had also Mr. Forsyth’s credentials, and knew what his authority was, and that it was confined to the exchange of the ratifications of the treaty as it was signed, and that he had no authority to make any other compact, and that none could be made except by and with the advice of the Senate. And with this knowledge the Spanish government assented to and ratified the treaty as it was signed, and exchanged its ratifications with the United States.
And I think that as to the allegations so far considered, the evidence shows that Mr. Meade filed his claim, seeking the provision to be made by the treaty for all claimants under it. ' That he sought and made the liquidation of his claim with Spain for the purpose of presenting it for payment under the treaty. That after it was ascertained that the claims to be presented would exceed the fund provided by the treaty for their payment, he claimed first of Spain and then of the United States that his claim should be preferred above all others, and he be paid in full, while other claimants were paid only pro rata. This was not acceded to.
Then the evidence shows that Mr. Meade carried his claim before the commissioners under the treaty, and as its proof, offered the Spanish liquidation, which they rejected, and required of him the original evidence. ' '
This was the action of the commissioners, and not of the United States, who had no control over it and are not responsible for it, even if it were erroneous ; for, as declared by the Supreme Court, (1 Peters, 212, Comegas v. Vasse,) the jurisdiction of the commissioners was exclusive, and their judgment conclusive, and it was for them, and them only, to determine what effect comity required should be given to the decision of a foreign tribunal under a treaty which expressly required that the decision of all claims should be by an American tribunal which it constituted.
To this decision of the commissioners Mr. Meade objected, but he had anticipated it, for in his memorial to the President, dated February 8, 1821, before the appointment of any commissioners or the ratification of the treaty by the Senate, he refers to the action to be had on his claim under the provisions of the treaty, as follows : “It is to be re-examined and adjudicated over again by a new commission, which may not and probably will not be closed in a less period than three years, commencing from some undefined point of time hereafter, viz : the meeting of the commissioners in Washington, and which, if it he *294 decided, as possibly it may, to investigate over again tbe merits and details of my claim, will have to invoke documentary evidence from tbe bureaus of a foreign country peculiarly tenacious of its archives.”
After tbe decision of tbe commissioners Mr. Meade waited a year, and then filed with the commissioners a specification of tbe evidence he wished to be demanded by them of the Spanish government, as the treaty required. The commissioners transmitted their demand to Mr. Adams, and he instructed Mr. Nelson, then appointed minister at Madrid, to make the necessary requisition on the Spanish government. This was done; but the evidence did not arrive before the expiration of the commission limited by the treaty, and Mr. Meade thus failed of a'hearing before them. This brings the case to the remaining allegations made in behalf of the petitioner.
It is claimed that the United States are legally bound to pay Mr. Meade’s claim, because of the delay in calling on Spain for its vouchers at the instance of the commissioners. The only evidence of this is the fact that Mr. Adams’s letter of instructions to Mr. Nelson was dated 13 th May, 1823, and.Mr. Nelson’s letter to the Spanish minister in Madrid was dated December 19, 1823. But this does not prove remissness in Mr. Nelson, or that his remissness was the reason the vouchers were not had in season. At the most it can only raise a presumption of that which is abundantly rebutted in the evidence. It is observable that this claim of remissness in Mr. Nelson was never made by Mr. Meade, and the reason for that is much more obvious than the reason why it is made now. The report of Mr. Everett, to which we have been referred by the counsel of the claimants, shows that when Mr. Nelson arrived off Cadiz the port was bockaded, and he could not enter it then, and did enter it when the blockade was raised, and Spain was at war, and her archives and records scattered through her cities. Mr. Meade’s personal and accurate knowledge of the circumstances of his case is not to be questioned, and he says in his memorial to Congress, January 10, 1825, (Am. St. P., 716:) “ The various circumstances and accidents that delayed Mr. Nelson's departure, and' after his departure, his arrival at Madrid, which he did not reach till December, 1823, are well known. Indeed, if his arrival had been in better season, it is not probable that his application could have availed to obtain the documents alone necessary to fulfil the rule of evidence laid down by the commissioners in the case of your memorialist, and after the documents had been procured there would have been wide gaps in the evidence to fill up, in the way of which obstacles of equal magnitude presented themselves.”
*295 The fact stated by Mr. Everett, and the testimony of Mr. Meade, sufficiently rebut the presumption raised by the counsel for his representatives, as to the remissness of Mr. Nelson, without recurring to the rules of law that the government is not liable for the delinquencies of its officers, and that laches cannot be imputed to the sovereign.
Since the death of Mr. Meade, in 1828, another ground of claim has been founded by his representatives on the treaty made between the United States and Spain, 1834; and it is alleged that Spain was in default under the treaty of 1819, in not furnishing the documents called for in Mr. Nelson’s communication to the Spanish minister on December 19,1823, and that by the treaty of 1834 the United States released Spain from her liability, and thus became liable themselves to pay Mr. Meade’s claim.
The gist of this accusation is that Spain was in default, as alleged, under the treaty of 1819. Therefore it is necessary to determine what her obligation under that treaty was. Now, the obligation of Spain under the treaty was to furnish “ documents to be specified when demanded at the instance of the commissioners,” so that by the words of the treaty her obligation extended only to documents “ demanded at the instance of the commissoners and the record shows that the parties so construed and acted on the treaty. Mr. Forsyth, in his official letter to Mr. Adams of April 20, 1822, states his application to the Spanish secretary of state for papers relating to another claim, that of Mr. Prible, and he says as follows : “After stating the obligation of Spain under the treaty to deliver the papers when demanded at the instance of the commissioners, I desired to know if there could be any objection to furnishing such as I could specify in anticipation of the commissioners. He replied that by the treaty the commissioners were made the judges of what documents were necessary, and that this government could not know but by their decision what documents it was under the obligation to deliver. I stated to him that as a matter of right we could claim the documents when called for at the instance of the commissioners; but as a matter of accommodation we should be glad to receive them in the way proposed. He said he thought it was best to adhere strictly to what was stipulated ; it was the only way to avoid a great deal of unnecessary trouble.” And then Mr. Forsyth adds : “ From this conversation I consider it useless to make further efforts.” This shows, I think, clearly the claim of Spain that her obligation extended only to documents demanded at the instance of the commissioners, and the assent of the United States *296 to that, and that documents could only be asked for, otherwise, as “ an accommodation.”
And such is the necessary effect of the words of treaty by the rule “ expressio unius est exclusio alterius,” which is as applicable to treaties between nations as to contracts between individuals; and though it has been claimed otherwise in Congress in this case, it certainly was never judicially held that where a party to a treaty or contract agreed to do a thing in a specified way, he was bound to do it in that way, and also in every and any other way.
The only demand made on Spain for documents at the instance of the commissioners was that transmitted to the Spanish secretary of state by Mr. Nelson, on the 19th December, 1823, and the commission exposed by its limitation in the treaty, on June 8, 1824, so that Spain had less than six months in which to perform the task required of her. What that was is shown by the record. .
The evidence shows that the Spanish government was called upon for the papers of eight other cases besides this, (C. C. Reports, 300, S., 3,) and ‘in this case alone the mere specification of papers by their titles fills nine printed pages of the record, and in many instances the specifications of the papers relating to an item of claim is thus concluded, “and all other papers relating to said claim.” And for many of the items of claim the call is for official papers in various offices specified, as thus: “all the documents and official papers in the offices of the intendant of Cadiz, the treasurer general, and of the minister of finance, from the year 1814 to the year 1819, on this subject.” Then another part of the call is for the papers and records in eight different legal proceedings or suits at law in different cities ; and again for the correspondence of the Spanish ministers and officials as to the claims specified, and for certificates of official transactions and of the facts, and of the Spanish law involved in them. Then the record shows that in the troubles of the country the public records had been removed from the capital, and were scattered to different cities, from which the Spanish government had to collect them to return them to the capital; and the Spanish minister, in his first reply to Mr. Nelson, refers to this fact, and says “ as soon as they arrive we will proceed to search for those which you demand ;” and in another reply to Mr. Nelson, he says : “Your penetration saved me the trouble of pointing out the absolute impossibility of collecting in a very short time the documents which are required, either on account of their extent in some of the said cases, or their great number in others, especially that of Mr. Richard W. Meade.” And Mr. Nelson, in *297 bis report of these things to Mr. Adams, says “the Spanish government seems disposed to proceed with the calls made upon them for papers, and we may now be permitted to hope that most of the records which have been asked for will be supplied before a very distant day. From this calculation, I fear, we must exclude the papers in Meade’s ease, which being so voluminous, although entered upon by the Spanish officers apparently in good faith to supply them, seem to forbid any well-founded expectation that they can he very speedily furnished ; and much stronger and conclusive evidence against the alleged default in Spain is given by Mr. Meade, in his memorial last cited. He says “ the troubles and commotions by which the whole country had been convulsed and distracted in consequence of the re-establishment of the constitution in 1820, and the subsequent struggle to maintain it against the united forces of legitimacy at home and abroad, are too well known to require any illustration of the impediments they must necessarily have presented to such minute, diversified, and laborious researches into the public archives as would have been necessary in the single case of your memorialist. * * * * No reluctance whatever has been manifested by the Spanish authorities to comply with these calls for papers, which in fact have been attended to with as much alacrity and expedition as are at all consistent with the habits of business, or perhaps practicable in the existing state of affairs. The delay has been produced solely by imperious circumstances beyond any human control, and by the lateness of the hour at which the application has been made, itself the effect of the same imperious circumstances.”
And the declarations of Mr. Meade, the intestate, are evidence against his administrator who represents his estate here. And as nothing conflicts with them they are conclusive, and they prove against him that Spain was not in default under the treaty of 1819 in not furnishing the documents before the commission expired. And if there was no such default, then there could be no claim upon it, either in the United States or Mr. Meade or his representative, to be surrendered by the treaty of 1834.
It was alleged by the counsel for the petitioners that Spain had not furnished the documents called for by Mr. Nelson since the commission expired. But when the commission expired Spain’s obligation to furnish evidence ceased, for then there was nothing left for litigation or evidence under the treaty. All the claims proved within the time limited by the treaty had been adjudged and the fund distributed ; final judgment had been rendered by the tribunal constituted by the *298 treaty, whose jurisdiction was exclusive and whose judgments were conclusive. From this final judgment there was no appeal, and there was no power or authority to reopen the litigation or recall the fund or revive the tribunal. As to all these the provisions of the treaty -weiejioncti officio. And Spain was under no obligation except by the treaty, for there is no rule of the law of nations which requires a nation to furnish evidence from her archives ,to all foreign litigants, or subjects her to compulsion if she does not do so. By the terms of the treaty the obligation of Spain was to furnish evidence for the adjustment of the claims included in the treaties and no others. And as the treaty contemplated and provided for the adjustment of all those claims by the commissioners and not otherwise, Spain was bound to furnish evidence for their adjustment and no other. And when that was expressly limited to three years her obligation could not be extended beyond that.
Besides this, I think the allegation that Spain has not furnished the evidence she was bound to furnish, since the commission expired, is not warranted by the evidence and is impugned by Mr. Meades own declaration. In his memorial last cited, (4 Am. St. P., 717,) of January 10, 1825, he says, “ Tour memorialist has recently received from Spain a large mass of documentary and other evidence in addition to what was laid before the commissioners.”
Now there is no evidence that Spain ever had in her possession all the documents which Mr. Meade specified to the commissioners; and there is nothing in the case to show or indicate that this “large mass of documentary and other evidence” which Mr. Meade received was not all the evidence Spain had in her possession when the call was made on her or thereafter; so that all, the evidence as to the alleged default of Spain in not furnishing evidence is Mr. Meade’s declarations, that Spain responded to the only call made upon her under the treaty “ with as much alacrity and expedition as was at all consistent with the habits of business,” and furnished afterwards “a large mass of documentary and other evidence.” And on this evidence it would appear that Spain had fulfilled and transcended all her treaty obligations.
On the whole case I am of opinion that the allegations of the petitioner are not proved, but are disproved by the evidence, and that he has no claim against the United States in law or equity, and that they are entitled to judgment.